EAST LAMPETER TOWNSHIP,
Petitioner,

v.

PENNSYLVANIA STATE HORSE
RACING COMMISSION,
Respondent.

LANCASTER COUNTY PENNSYLVA-
NIANS AGAINST GAMBLING
EXPANSION, Petitioner,

v.

PENNSYLVANIA STATE HORSE
RACING COMMISSION,
Respondent.

Commonwealth Court of Pennsylvania.

Argued Sept. 9, 1997.
Decided Oct. 24, 1997.
Publication Ordered Dec. 23, 1997.

Elizabeth A. Hambrick-Stowe, Lancaster, for petitioner, East Lampeter Tp.

Jorge M. Augusto, Harrisburg, for respondent.

Bradley K. Moss, Philadelphia, for intervenor, National Turf Club, Inc.

Before McGINLEY and PELLEGRINI, JJ., and JIULIANTE, Senior Judge.

## ORDER

PER CURIAM.

AND NOW, this 23rd day of December, 1997, it is ORDERED that the above-captioned opinion filed October 24, 1997 shall be designated OPINION rather than MEMORANDUM OPINION, and it shall be reported.

JIULIANTE, Senior Judge.

East Lampeter Township and the Lancaster County Pennsylvanians Against Gambling Expansion (PAGE) (collectively, the Township)[1] petition for review from a July 8, 1996 order of the Pennsylvania State Horse Racing Commission (Commission) which gave final approval to Penn National Turf Club's (Penn National) application for an off-track wagering facility (OTW) in Lancaster County, Pennsylvania. We affirm.

On August 3, 1995, Penn National filed Part I of a nonprimary location statement (statement)[2] with the Commission seeking approval of an OTW in East Lampeter Township, Lancaster County, Pennsylvania. This three-part statement is required when a licensed corporation seeks to establish a facility in a nonprimary location.[3] 58 Pa.Code § 171.21 (the Code).

Pursuant to sections 171.22(b) and 171.23 of the Code, the Commission advertised a notice of a public hearing to be held on September 12, 1995 at the Holiday Inn located in Lancaster County.[4] 58 Pa.Code §§ 171.22(b), 171.23. The advertisements of the public hearing appeared in the *New Era* and the *Intelligencer Journal* on August 31, September 1, 2, and 3, 1995. The purpose of the hearing was to receive public comment on the proposed facility. 58 Pa.Code § 171.23(b).

At the September 12, 1995 hearing, Penn National presented a slide program that gave on overview of the OTW itself and of the factors the Board needed to weigh in its consideration of Penn National's statement.[5] Also present at the hearing were various members of the community. Pursuant to section 171.23(d) of the Code, approximately sixteen persons spoke regarding Penn National's statement. 58 Pa.Code § 171.23(d). With the exception of one individual, all the speakers opposed the OTW. In addition, the Township presented the Commission with literally hundreds of letters and petitions in opposition to the OTW.

On October 18, 1995, the Commission entered an order approving Part I of Penn National's statement, which only approved

---

**1.** Although the captions list only the Township and PAGE as petitioners, the Township's petition for review also includes as parties five elected township supervisors.

**2.** A "nonprimary location statement" is defined as "[t]he written statement pursuant to this act submitted to the appropriate commission by a licensed corporation planning to establish a nonprimary location." Section 102 of the Race Horse Industry Reform Act (the Act), Act of December 17, 1981, P.L. 435, *as amended*, 4 P.S. § 325.102.

**3.** A "nonprimary location" is defined as "[a]ny facility in which pari-mutuel wagering is conducted pursuant to this act other than the primary racetrack location." Section 102 of the Act, 4 P.S. § 325.102.

**4.** The Holiday Inn is not located in the Township.

**5.** The specific factors to be considered by the Board are discussed *infra*.

the site of the facility. The Township filed a petition for review on November 17, 1995. This Court quashed the petition as interlocutory. Penn National filed Part II of its statement on February 1, 1996, which was approved by the Commission on March 13, 1996. Penn National submitted Part III of its statement on June 11, 1996. The Commission approved Part III on July 8, 1996.[6] This appeal followed.[7]

The Township has presented the following issues for review: 1) whether the Commission abused its discretion when it held the public hearing pursuant to 58 Pa.Code § 171.23; 2) whether the Commission abused its discretion and erred as a matter of law in failing to consider the detrimental effect of the OTW on the local community; 3) whether the Commission abused its discretion and erred as a matter of law by equating the public interest with the effect that an OTW would have on the racing industry; and 4) whether the Commission's findings are supported by substantial evidence of record.[8]

■ The Township first maintains that the Commission abused its discretion when it held its hearing on the OTW. The Township's argument is two-fold: that the Commission did not give adequate notice of the hearing and that the hearing should have been held at a facility within the Township.

> Section 171.23(b) of the Code provides that [t]he notice of public hearing shall be published on at least 4 consecutive days in a prominent section of a newspaper of general circulation for the county in which the non-primary location is situated.

58 Pa.Code § 171.23(b).

Quite clearly, the Commission complied with the time requirement of this regulation when it advertised the proposed September 12, 1995 hearing in the *New Era* and *Intelligencer Journal* on August 31, September 1, 2, and 3, 1995. The last notice was published nine days prior to the actual hearing.

The Township complains that the notice was published over a holiday weekend which thereby reduced the number of people who actually saw the notice (presumably because families travel over the long weekend) and were able to respond to it. This evidence does not support this contention.

The Code does not specify how far in advance of the hearing notice must be given, nor does it reference those instances where publication occurs over a holiday weekend. This type of concern is addressed by the requirement that the Commission publish the notice on four consecutive days prior to any hearing. If we accept the Township's argument, it would be tantamount to burdening the Commission with the responsibility of estimating the *actual* readership of a newspaper at any given time. This is precisely what is avoided by the requirement that the notice appear in a newspaper of general circulation.

■ Likewise, the Commission did not abuse its discretion when it chose the site of the hearing. Section 171.23(c) of the Code requires that the public hearing be conducted in the county in which the proposed facility is located. 58 Pa.Code § 171.23(c). In its argument, the Township suggests a "hierarchy" of preferred hearing sites.[9] The law, however, as written, only requires that the hearing take place in the COUNTY in which the proposed facility is located. There is no dispute that the site of the hearing (Holiday Inn) is located in Lancaster County. Clearly, the Commission complied with the regulations regarding the hearing site.

---

6. Pursuant to the Sunshine Act, Act of July 3, 1986, P.L. 388, 65 P.S. §§ 271–286, a second public hearing was held to adjudicate Part III of the statement. At this hearing, members of the community were once again given an opportunity to voice their opinions on the OTW.

7. The Township filed its petition for review on July 9, 1996 and PAGE filed its petition for review on July 19, 1996. The petitions were consolidated on September 23, 1996.

8. Our scope of review is limited to determining whether constitutional rights have been violated, whether an error of law has been committed, or whether the necessary findings are supported by substantial evidence of record. *Luzzi v. State Horse Racing Commission*, 120 Pa.Cmwlth. 215, 548 A.2d 659 (1988); Section 704 of the Administrative Agency Law, 2 Pa.C.S. § 704.

9. This argument is based upon the Township's reading of the Pennsylvania Bulletin.

Further, in reference to both the notice and location arguments, we note that the Township has failed to introduce any evidence that either the Township or its residents suffered any harm or prejudice. At the hearing, the Township did not introduce any evidence suggesting that members of the community were unable to attend because of the hearing date or because of its location.[10] Quite the contrary is true.

In the nine days between the last published notice of hearing and the hearing date itself, the Township gathered literally hundreds of petitions and signatures in opposition to the OTW. At the hearing, approximately fifteen people spoke in opposition to the OTW.[11] Thus, we would be hard-pressed to find that the Commission abused its discretion when, in fact, the Township and its residents were able to gather such support and present their position to the Commission in the manner described above.

In the Township's second and third allegations of error, it maintains that the Commission abused its discretion and erred as a matter of law by failing to consider the detrimental effect of the OTW on the local community and by equating the public interest with the effect of an OTW on the horse racing industry. We disagree.

In determining whether the nonprimary location statement meets the legislative intent of the Act, the Commission must consider:

    a.   the purpose and provisions of the Act;
    b.   the public interest;
    c.   the integrity of live racing;
    d.   the impact on the local community;
    e.   the potential for job creation; and
    f.   the quality of the physical facilities and all services to be provided therein.

10. The Township argued that Township residents were unable to attend the hearing because their horse-drawn buggies could not maneuver the roads to the hearing site.

11. In addition to those who spoke in opposition, one county resident spoke in favor of the facility. There were other members of the community present as well; however, not everyone present spoke.

12. The Township claims that there are not enough people to fill the jobs already existing in

Section 218(g)(5)(iii) of the Act, 4 P.S. § 325.218(g)(5)(iii).

■ The Township argues that the Commission completely failed to consider the impact the OTW would have on the local community. Among the Township's concerns are 1) religious opposition to the facility, 2) an increase in crime, 3) an increase in alcohol consumption (by virtue of an additional liquor license in the area), 4) an increase in traffic, 5) a detrimental effect on local businesses,[12] and 6) a drain on the community's resources (i.e., fire and police protection).

In its decision approving Part I of Penn National's statement, the Commission stated that

[a]fter consideration of the factors set forth above [referring to the factors in 4 P.S. § 325.218(g)(5)(iii)], the Commission concludes that Part I of the statement should be approved. Penn National anticipates that the proposed nonprimary location will reduce attendance at its racetrack by 2 percent. Penn National also anticipates that the proposed facility will generate additional handle per year on races conducted at other Pennsylvania racetracks. The increased handle generated by the proposed facility will increase purses offered to horsemen at the racetrack. Increased purses will heighten competition at Pennsylvania racetracks thereby increasing the quality of racing and interest from the general public. Accordingly, the Commission determines that the proposed facility will have a positive effect on the integrity of live racing.

During the public meeting, Penn National Turf Club, Inc., stated that construction of the proposed facility will create construction jobs within the local community.

the area and that the OTW would only exacerbate the problem. Additionally, the Township contends that it would lose revenue from its tourism industry. It claims that, if the OTW was permitted, individuals who planned to travel to the area to experience the Amish way-of-life would not do so because an OTW is inconsistent with that image. The Township, however, has not offered any evidence to support these allegations.

Additionally, Part I of the statement represents that 118 persons will be employed at the proposed facility on a full and part-time basis. Penn National Turf Club, Inc. intends to hire as many people as possible from the local community. Accordingly, the Commission finds that the proposed facility will create jobs within the local community.

Under the regulations of the Commission, consideration of the physical facilities to be provided at the proposed location is deferred until Part II of the statement. Nevertheless, Pennsylvania National Turf Club, Inc. provided a description of the proposed facility at the public meeting. This description indicated that the facility will contain a high class restaurant and quality handicapping [sic] facilities of the type contemplated by the General Assembly.

The proposed nonprimary location will serve the public interest in that it will help revitalize the racing industry. The proposed nonprimary location will increase handle, thereby increasing both payments to horsemen competing at racetracks in the Commonwealth and revenue to the Commonwealth.

(March 13, 1996 Decision of the Commission at 6–7.)

While the Township's lack of interest in the OTW is one consideration, it alone is not determinative of the impact on the entire local community. Penn National presented a slide program which addressed some of the concerns expressed by the residents.

For instance, Penn National conducted a traffic survey to determine whether there would be an increase in traffic in the area. The OTW is actually located in a shopping complex. There are existing traffic patterns established for entry into the complex and parking is readily available. With this in mind, as well as the OTW's hours of operation, the survey concluded that no burdensome increase in traffic would occur.

Additionally, Penn National stated that it would contract for supplies and services from local agencies (i.e., food supplies, utilities, advertising, etc.).[13] This is in addition to the construction jobs that would be created when the facility needs to be renovated. From this slide program, the Commission was able to conclude that the community, as a whole, would benefit in terms of revenue and employment.

Although we recognize the Township's concerns, we find that the Commission had sufficient evidence to conclude that those concerns did not outweigh the positive contributions that the OTW would provide to the community.[14]

■ The Township's third allegation of error states that the Commission erred when it equated the "public interest" with the effect that an OTW would have on the horse racing industry. The Township argues that the legislature intended that the Commission address the "public interest" separately from the impact of an OTW on the horse racing industry. Specifically, the Township states that the legislature must have intended "public interest" to have a separate meaning because the Commission's consideration of the "purposes and provisions of the Act" would encompass "public interest." Otherwise, it would not be separately delineated as a factor for the Commission to consider. We disagree.

First, as Judge Keller noted in his July 12, 1996 denial of the Township's application for supersedeas, the General Assembly has de-

---

13. The slide presentation also projected Penn National's tax liability to the Township and County which would result from operation of the facility.

14. While the Commission need be aware of the Township's concerns regarding liquor and the facility's proximity to a school zone, in reality, it has no authority to intervene in that area. Although the OTW regulations require a statement that the facility be at least 300 feet from a church, hospital, charitable institution, school, public park or playground, a liquor license can only be obtained from the Liquor Control Board. 58 Pa.Code § 171.22; Section 404 of the Liquor Code, Act of April 12, 1951, P.L. 90, as amended, 47 P.S. § 4–404. Additionally, the facility must meet local zoning requirements that are established by the local governing body. In this matter, Penn National has obtained the requisite zoning permits. The record does not reflect whether the OTW has a liquor license.

termined that the "public interest" referred to in the Act is the "public interest" of the Commonwealth, not that of the specific locality. Second, a reading of both sections of the Act reveals that section 218(g)(5)(iii) mirrors section 218(g)(5)(ii), 4 P.S. §§ 325.218(g)(5)(ii) and (iii).

When interpreting a statute, the court must ascertain and effectuate the intent of the General Assembly and give full effect to each provision of the statute if at all possible. Section 1921(a) of the Statutory Construction Act of 1972, 1 Pa.C.S. § 1921(a); *MacElree v. Chester County*, 667 A.2d 1188 (Pa.Cmwlth.1995), *petition for allowance of appeal denied*, 545 Pa. 666, 681 A.2d 180 (1996). Where the language contained in the statute is clear, the words and phrases must be used in accordance with their common and accepted usage. *Pennsylvania State Police Bureau of Liquor Control Enforcement v. Scioli–Turco Post 593, V.F.W.*, 668 A.2d 1207 (Pa.Cmwlth.1995), *petition for allowance of appeal denied*, 544 Pa. 687, 679 A.2d 231 (1996).

In *MacElree v. Chester County*, this Court addressed the issue of whether the terms "compensation" and "salary" had different meanings in regard to the remuneration of a full-time district attorney for a third or fourth class county. In *MacElree*, the appellant was hired as a full-time district attorney. Under section 1401(g) of the County Code, Act of August 9, 1955, P.L. 323, *as amended*, 16 P.S. § 1401(g), a full-time district attorney in a third or fourth class county is to be compensated at the rate $1,000.00 lower than the compensation rate of a judge of the court common pleas in the respective judicial district. Appellant sued, alleging that his remuneration was significantly lower than that of the trial judges because the trial judges (who are state employees) receive state pension and retirement benefits that were not considered when appellant's rate of pay was established. Appellant argued that the terms "compensation" (as used in the County Code in reference to the rate of pay for full-time district attorneys) and "salary" (as used in reference to the rate of pay for part-time district attorneys) had separate and distinct meanings, the former encompassing pension benefits as well as weekly remuneration. *Id.*

In determining that the General Assembly intended to use the term's "compensation" and "salary" interchangeably, we noted that if the General Assembly had contemplated different meanings for those terms, it would have expressly provided those meanings. *Id.* Likewise, in the case before us, had the General Assembly intended the term "public interest" to have two different meanings within the same section of the same act, it would have expressly provided those definitions.

And finally, we do not agree with the Township's fourth allegation of error; that being, the Commission's decision is not supported by substantial evidence. Substantial evidence is "such relevant evidence as a reasonable mind can accept as adequate to support a conclusion." *D & H Corp. v. Pennsylvania Public Utility Commission*, 149 Pa.Cmwlth. 507, 613 A.2d 622 (1992), *petition for allowance of appeal denied*, 534 Pa. 642, 626 A.2d 1160 (1993).

Our review of the record reveals that the Commission had before it all the necessary documentation needed to proceed on Penn National's application. Further, the Commission was presented with a slide presentation which addressed the concerns of the local community and the effect that the OTW would have on the public interest. There is ample evidence that the factors of section 218(g)(5)(iii) were considered.

The legislature has vested wide discretion with the Commission, and the Court must grant deference to the latter's orders unless there is a clear abuse of discretion. The abuse of discretion cannot merely be an error in judgment, but must be an instance where, upon reaching its conclusions, the Commission has overridden or misapplied the law. *Cashdollar v. State Horse Racing Commission*, 143 Pa.Cmwlth. 650, 600 A.2d 646 (1991). We find no abuse of discretion has occurred here.

#### ORDER

AND NOW, this 24th day of October, 1997, the order of the Pennsylvania State Horse

 

Racing Commission dated July 8, 1996, is hereby affirmed.

LEADBETTER, J., did not participate in the decision in this case.