# In re Condemnation by West Chester
# Area School District

C.P. of Chester County, no. 00-02751.

*James H. Thomas* and *Alan P. Novak,* for condemnor.

*Donald F. Kohler Jr.* and *Joseph E. Brion,* for condemnee Singer.

*Fronefield Crawford Jr.* and *Michael T. Imms,* for condemnee East Bradford Township.

MAHON, *J.,* January 2, 2001—And now, January 2, 2001, on consideration of the preliminary objections interposed by the Township of East Bradford, Chester County, and by Michael Singer[1] to the declaration of taking filed by the condemnor, the West Chester Area School District,[2] on April 6, 2000 with respect to about 105 acres of a tract of land then titled in the name of condemnee Singer and located within East Bradford Township, on which tract the school district has proposed to construct a new high school;[3] and on further consideration of the response of the condemnor school district and the record made by the parties pursuant to our orders of June 20 and August 25, 2000 and section 406(e) of the Eminent Domain Code[4] and following an

---

1. Pursuant to section 406 of the Eminent Domain Code, Act of June 22, 1964, Sp. Sess. P.L. 84, as amended, 26 P.S. §1-406. Condemnee Michael Singer will be at times referred to hereinafter as "Singer" and condemnee East Bradford Township as "township."

2. Sometimes referred to hereinafter as the "school district."

3. To be known as the B. Reed Henderson High School.

4. See also, C.C.R.C.P. no. 206.1(c)(4). The parties, by stipulation filed October 27, 2000, have agreed "that the record [in this matter]

evidentiary hearing and oral argument conducted on October 20, 2000 we enter the following:[5]

## OPINION

On April 6, 2000, the school district filed with this court a declaration of taking with respect to a portion of the lands of Michael Singer located in East Bradford

---

consists of the briefs, motions, replies and the deposition transcripts filed and submitted to the [undersigned]." The school district's table of exhibits lists 13 separate items to be included as part of the record; condemnee Singer lists 42 documentary exhibits; and condemnee East Bradford Township lists 35 exhibits. In addition, the record includes the transcribed depositions of: Suzanne K. Moore, taken August 4, 2000; Joseph P. Green Jr., Esquire, taken August 14, 2000; Thomas Wolpert and Debra Arvanites, taken August 16, 2000; Harry W. Protzmann Jr., taken August 17, 2000; Harry M. Best III, Florence Miller, and Kathryn O. Thompson, taken September 1, 2000; Ernest Graham, taken September 6, 2000; Pauline Bachtle, taken September 7, 2000; Michael P. Lynch, taken September 8, 2000; and of Robert Harsh, Robert B. McKinstry, and Elizabeth Rump, taken September 28, 2000. The transcripts of a majority of the depositions noted contain references to (and in many instances, append) extensive documentary exhibits identified during the testimony. In the aggregate, the record encompasses about 1,000 pages of transcribed testimony and a substantially greater number of pages of documentary exhibits. We have reviewed the whole of the record with care although much of it was, in the end, unnecessary to our ultimate disposition of the issues presented.

5. Consolidated for disposition with the preliminary objections is the original action to docket no. 00-03327, commenced by the writ of summons of Singer and the township, and alleging violations by the school district of the Pennsylvania Sunshine Act, the Act of October 15, 1998, P.C. 729, 65 Pa.C.S. §701 et seq. and the Right-to-Know Act, the Act of June 21, 1957, P.L. 390, as amended, 65 P.S. §66.1 et seq.; and no. 00-03598, being the school district's appeal under the Local Agency Law; subchapter B of chapter 5 and subchapter B of chapter 7 of the Act of April 28, 1978, P.L. 202, as amended, 2 Pa.C.S. §§105, 551-555, and 751-754 from the township's action, described in the text below,

Township,[6] known as Timbertop Farms, aggregating some 172 acres (of which about 105 acres were taken), more particularly designated as Chester County tax parcels nos. 51-5-37 and 51-5-43, acquired by Singer in 1972, and lying between U.S. Route 322[7] and Pennsylvania Route 162[8] directly across Route 322 from and to the south of an existing educational facility of the school district. The township was also named as a condemnee on account of its interests in a portion of Singer's lands for park and trail purposes which the township acquired on April 3, 2000, three days before the condemnation, in the form of an easement for a term of 15 years. The purpose of the condemnation was to permit the construction of a high school and related facilities including athletic fields and an athletic stadium.

The declaration of taking was filed at 9:45 a.m. on April 6, 2000 following a meeting of the board of school directors specially scheduled and convened at 8 a.m. that morning. At noon that same day, April 6, 2000, the

designating Singer's property as part of the township's agricultural security area. These consolidated matters were reassigned to this writer by order dated October 18, 2000.

6. East Bradford Township is one of eight municipalities making up the West Chester Area School District. The others include the Borough of West Chester; and the townships of East and West Goshen; West Whiteland; Westtown; Thornbury, Chester County; and Thornbury, Delaware County. Two of the school district's elementary schools are located in East Bradford Township. The East Bradford Elementary School is located at 820 Frank Road to the north of the Singer property across Downingtown Pike; Hillsdale Elementary School is located on West Market Street in the township. The existing high schools of the district are located in East and West Goshen townships.

7. Also known as Downingtown Pike.

8. Also known as Strasburg Road.

township's governing body convened a public meeting noticed and scheduled for the purpose of considering Singer's February 29, 2000 application for inclusion of his lands in the township's agricultural security area, a protected zone created by the township's resolution of August 13, 1985 promulgated pursuant to the Agricultural Area Security Law, the Act of June 30, 1981, P.L. 1281, 3 P.S. §901 et seq. The school district, by its solicitor, attended the meeting of the township's governing body and objected to any action with respect to Singer's application on the ground that the filing of the declaration of taking several hours earlier had the immediate effect of transferring title in the condemned lands to the school district as condemnor[9] and the school district desired to withdraw and did not consent to or join in the application for agricultural security area protection.

It is generally agreed that inclusion of Singer's lands in the township's agricultural security area would impede, if not prevent, the exercise by the school district with respect thereto of its power of eminent domain.[10]

---

9. See section 402(a) of the Eminent Domain Code, 26 P.S §1-402(a) which provides, in pertinent part:

"(a) Condemnation . . . shall be effected only by the finding in court of a declaration of taking . . . and thereupon the title which the condemnor acquires in the property condemned shall pass to the condemnor on the date of such filing."

10. The parties have not elaborated on the reasons that underlie this consensus. We note that sub-sections 13(a) and (b) of the Agricultural Area Security Law, 3 P.S. §13(a) and (b) provide:

"(a) No agency of the Commonwealth having or exercising powers of eminent domain shall condemn for any purpose any land within any agricultural security area which land is being used for productive agri-

The township refused the school district's request to withdraw Singer's lands from consideration for agri-

---

cultural purposes (not including the growing of timber) unless prior approval has been obtained with criteria and procedures established in the section from the Agricultural Lands Condemnation Approval Board.

"(b) No political subdivision, authority, public utility or other body having or exercising powers of eminent domain shall condemn any land within any agricultural security area for any purpose, unless prior approval has been obtained from each of the following bodies: The governing bodies of the local government units encompassing the agricultural security area, the county governing body, and the Agricultural Security Area Advisory Committee."

The term "agency of this Commonwealth" is not defined in the Agricultural Area Security Law although it is defined in other enactments including the Conservation District Law where it "include(s) the government of this Commonwealth and any subdivision, agency or instrumentality, corporate or otherwise, of the government of this Commonwealth." See 3 P.S. §851(b). The term "political subdivision" is undefined in the Agricultural Area Security Law but is defined in the Statutory Construction Act of 1972, the Act of December 6, 1972, as amended, 1 Pa.C.S. §1996 as "[a]ny county, city, borough, incorporated town, township, school district, vocational school district, and county institution district."

It further appears from the uncontested affidavit of William Beam taken October 20, 2000 that Singer's lands have been "farmed . . . for approximately the last six years." In the absence of evidence or argument to the contrary it would appear that Singer's lands were on April 6, 2000 "being used for productive agricultural purposes."

Assuming the accuracy of these factual predicates, the school district is governed by section 13(b) of the Agricultural Area Security Law and inclusion of Singer's lands in the township's Agricultural Security Area precludes condemnation for school purposes unless and until approval is sought and obtained from the Chester County Commissioners, the Agricultural Security Area Advisory Committee and the township's governing body. This issue is not presently before us except as a component of the explanation for the school district's precipitous action.

cultural security area protection and adopted[11] Township Resolution no. 00-3 granting Singer's application and including the lands at issue within the township's agricultural security area.

These consolidated actions followed by which the condemnees objected preliminarily to the declaration of taking; the school district sought review of the township's decision to include Singer's lands in the agricultural security area, and both condemnees sought review under the Right-to-Know and Sunshine or open meeting statutes of the school district's decision to authorize the filing of the declaration of taking.

The circumstances surrounding the action last described above and the identical preliminary objection, the condemnees' Sunshine Act[12] complaints, are as follows. As we indicated, the school district's governing body met at about 8 a.m. on Thursday, April 6, 2000, to consider the Singer condemnation. The meeting was convened at the district's Spellman Administration Building pursuant to a public notice published in the *Daily Local News,* a newspaper of general circulation in the district, on April 5, 2000.[13]

11. Supervisor Spangler abstaining.

12. Now codified by the Act of October 15, 1998, P.L. 729, 65 Pa.C.S. §§701-716. 65 Pa.C.S. §701 provides that "This chapter shall be known and may be cited as the Sunshine Act" and we will abide by this mandate notwithstanding the varying practice of other writers to refer to the "Sunshine Law."

13. See township exhibit no. 14. In this same edition of the *Daily Local News,* indeed, on the same page thereof, appeared the advertised notice of the meeting of the Board of Supervisors of East Bradford Township to be convened at 12 p.m. on April 6, 2000 at the township building for the purpose of considering Singer's application for inclusion of his lands in the township agricultural security area.

The condemnees assert that the public notice given of the school district's 8 a.m. meeting was legally insufficient in two respects, (1) that 24 hours' notice was not provided inasmuch as few readers of the *Daily Local News* could have been expected to have read the advertised notice 24 hours prior to the meeting, that is, by 8 a.m. on the day the particular edition of the paper was published; and (2) that no posted notice was provided.[14] Both of these requirements are found, inter alia, in the Sunshine Act, 65 Pa.C.S. §709, which provides:

"Section 709. Public Notice

"(a) Meetings . . . An agency shall give public notice of each special meeting or each rescheduled regular or special meeting at least 24 hours in advance of the time of the convening of the meeting specified in the notice."

The term "public notice" is defined in 65 Pa.C.S. §703 to require two separate and distinct acts: (1) "publication of notice of the place, date and time of a meeting in a newspaper of general circulation" and (2) "posting a notice of the place, date and time of a meeting prominently at the principal office for the agency holding the meeting or at the public building in which the meeting is to be held."

With respect to the 24-hour requirement for advertised notice, the condemnees have offered no authority for their contention that publication in that issue of a

---

14. The significance of the failure to provide required notice of the meeting is found at 65 Pa.C.S. §713 which provides that "[s]hould the court determine that the meeting did not meet the requirements of this chapter, it may in its discretion find that any or all official action taken at the meeting shall be invalid."

newspaper of general circulation published on the day preceding the noticed meeting is insufficient if some number of newspaper readers could not be expected to have obtained their copy of the periodical and to have reached and reviewed the classified notice section on or before a time 24 hours prior to the scheduled meeting. The reading habits or speed of actual or hypothetical readers cannot be the critical consideration.

The Pennsylvania Commonwealth Court considered an analogous contention in the decision reported as *East Lampeter Township v. Pennsylvania State Horse Racing Commission,* 704 A.2d 703, 705 (Pa. Commw. 1997). The applicable regulations required published notice on four consecutive days and the advertisement appeared in a newspaper of general circulation on August 31 and September 1, 2, and 3, 1995. Rejecting the municipality's challenge to the notice as insufficient, the court wrote the following:

"The township complains that the notice was published over a holiday weekend which thereby reduced the number of people who actually saw the notice (presumably because families travel over the long weekend) and were able to respond to it. This evidence does not support this contention.

"The Code does not specify how far in advance of the hearing notice must be given, nor does it reference those instances where publication occurs over a holiday weekend. This type of concern is addressed by the requirement that the commission publish the notice on four consecutive days prior to any hearing. *If we accept the township's argument, it would be tantamount to burdening the commission with the responsibility of esti-*

*mating the actual readership of a newspaper at any given time. This is precisely what is avoided by the requirement that the notice appear in a newspaper of general circulation.*" (emphasis supplied)

These considerations are equally compelling in this context. In addition, Sunshine Act §709(b) provides as follows:

"(b) Notice. With respect to any provision of this chapter that requires public notice to be given by a certain date, the agency, to satisfy its legal obligation, must give the notice in time to allow it to be published or circulated within the political subdivision where the principal office of the agency is located or the meeting will occur before the date of the specified meeting."

This provision supports the adequacy of the advertised notice here given by the school district by means which assured that the notice would be published within the constituent municipalities on the day before the date of the meeting.

We conclude that an advertised notice otherwise sufficient complies with the 24-hour requirement of 65 Pa.C.S. §709(a) if it appears in an edition of the newspaper actually published and available to readers thereof at least 24 hours before the scheduled meeting. The pertinent evidence of record takes the form of an affidavit of the publisher of the *Daily Local News,* Nancy M. Love, given October 11, 2000 by which the affiant states: "the *Daily Local News* is published in the morning. We guarantee delivery of the newspaper to homes and single copy outlets (stores and newstands) by 6:30 a.m. each morning (7:30 a.m. on Sundays) barring unforeseen circumstances such as a press breakdown."

There is neither allegation nor proof that the edition of the *Daily Local News* for Wednesday, April 5, 2000 was published and made available to its readers other than as described by the affiant to be the usual practice. We find that 24 hours' advance notice was given by published advertisement of the Board of School Directors' April 6, 2000 special meeting.

The evidence as to posting of notice of the school district's 8 a.m., April 6, 2000 meeting is that the person regularly charged with the responsibility to post such notices, School Board Secretary Pauline Bachtle, was on vacation during the critical period and had no knowledge as to whether the posting of notice was attempted or accomplished;[15] the district employee who assumed Secretary Bachtle's duties during this period, did not recall having been instructed to post notice or of having done so;[16] and other persons entering the Spellman Administration Building for the purpose of attending the 8 a.m. meeting did not observe any posted notice.[17] The school district was unable to adduce any affirmative evidence that anyone was instructed to post notice of the meeting; that anyone, in fact, did so; or that anyone observed a posted notice.[18] We find and conclude that notice of the 8 a.m., April 6, 2000 meeting of the board of school directors was not posted as required by law.

---

15. Bachtle deposition conducted on September 7, 2000 at pp. 13-17.

16. Florence Miller deposition conducted on September 1, 2000 at pp. 14-16.

17. See for example, affidavit of Robert Harsch.

18. Indeed, the school district does not seriously contend that notice was posted in any conventional sense and focuses its argument, instead, on the alternative contentions discussed in the text below. See brief of condemnor at pp. 47-50.

The school district responds to this objection with two arguments. First it contends that in the absence of a statutory definition of the verb "to post," the availability of the advertised notice within Board Secretary Bachtle's files in her office within the Spellman Administration Building constitutes substantial compliance with the regulatory mandate. We disagree. As we have indicated, 65 P.S. §709 requires two forms of public notice of a special or rescheduled regular meeting: advertised and posted. The verb "to post" is derived from the noun form which refers to "a vertical stick or pole fixed into the ground"[19] as well as the traditional practice of notifying the public by means of handbills and placards affixed to such prominent, public structures as lampposts and signposts. The etymology of the noun form of "post" is found in the Old and Middle English terms for "forward"[20] and "stand."[21] The transitive verb form was first used in the Seventeenth Century when it had, essentially, the current meaning "to publish, announce, or advertise by or as if by use of a placard . . . to affix to a usual place (as a wall) for public notices."[22]

---

19. Cambridge Dictionary of English, Cambridge University Press, 2000.

20. Being the word "por." See Merriam Webster's Collegiate Dictionary, 10th Edition 1999.

21. Being the word "stare." *Id.*

22. *Id.* To the same effect, Black Law Dictionary (5th Edition, West, 1979) defines the verb "to post" as follows: "to bring to the notice or attention of the public by affixing to a post or wall or putting up in some public place; to announce, publish, or advertise by use of a placard." It is a fundamental precept of statutory construction that "words and phrases shall be construed . . . according to their common and approved usage . . . ." 1 Pa.C.S. §1903(a). In construing the statutory requirement of posted notice found in the Real Estate Tax Sale Law,

The school district invites us to read the statute as if the mandate to post had no understood and generally approved meaning.[23] We decline so to do.

---

discussed in greater detail in the text below, the Commonwealth Court, in *Lapp v. County of Chester,* 67 Pa. Commw. 86, 90, 445 A.2d 1356, 1358, (1982) wrote: "[i]n the absence of specific statutory requirements, we hold that the method used [for posting] must be reasonable and such as would likely inform the taxpayer of the intended sale of the premises." Using this standard, the court rejected the adequacy of notice "merely folded . . . and thumbtacked . . . at the keyhole level to the doorframe of a side door of the house between the main door and the storm door." In *In re Upset Price Tax Sale of September 10, 1990,* 147 Pa. Commw. 52, 58, 606 A.2d 1255, 1258 (1992), the court reasoned that posted notice, to be adequate, must be placed somewhere for all to observe in "such manner as to attract attention." *Id.* See also, *Hunter v. Washington County Tax Bureau,* 729 A.2d 142, 143 (Pa. Commw. 1999); *Otto v. Dauphin County Tax Claim Bureau,* 24 D.&C.3d 709, 710 (Dauphin Cty. 1980); *Township of Derry v. Swartz,* 21 Pa. Commw. 587, 346 A.2d 853 (1975); *Ganzer v. Erie County Tax Claim Bureau,* 163 Pa. Commw. 522, 529, 641 A.2d 1261, 1265 (1994) (defining "posted" in accordance with its usual and customary meaning as "to affix (as a paper or bill) to a post, wall or other usual place for public notice." The school district's position, in contrast, inevitably brings to mind the words of Humpty Dumpty:

" 'When I use a word,' Humpty Dumpty said in a scornful tone, 'it means just what I choose it to mean—neither more nor less.' " Lewis Carroll

23. We note that a variety of enactments of this Commonwealth require posting of notices and other documents. A few examples include section 1802(a) of the First Class Township Code, the Act of June 24, 1931, P.L. 1206, as amended, inter alia, by the Act of June 26, 1995, P.L. 66; 53 P.S. §56802(a) to require that "advertisements for contracts or purchases shall . . . be posted in a conspicuous place within the township;" the Domestic Animal Hauler's Act; the Act of July 11, 1996, P.L. 561, requiring all licensees to "post a copy of the license . . . in or at the place of business of the licensee;" section 6 of the Utility Service Tenants' Rights Act, the Act of November 26, 1978, P.L. 1255, as amended, 68 P.S. §399.6, which requires that a statement of the tenants' rights in

The school district also presses a series of related defensive arguments to the effect that even if the posting of notice was not accomplished, the validity of the board of school directors' action authorizing the Singer

the event of discontinuance of utility service "be posted by the utility in those common areas of the building or mobile home park where it is reasonably likely to be seen by the affected tenants;" section 9 of the Pennsylvania Prevailing Wage Act; the Act of August 15, 1961, P.L. 987, as amended, 43 P.S. §165-9, which requires "contractors and subcontractors performing public work for a public body subject to the provisions of this Act [to] post the general prevailing, minimum wage rates . . . in prominent and easily accessible places at the site of the work;" section 3 of the Act of April 3, 1968, P.L. 92, as amended, 52 P.S. §30.203, having to do with mine fires and subsidence which provides that notice of the existence of a mine or bank fire must be posted upon the premises; section 2 of the Act of August 10, 1951, P.L. 1662, as amended by the Act of June 15, 1961, P.L. 445, 53 P.S. §14612 which requires in cities of the First Class the posting of notice of a determination that the premises is hazardous, structurally unsound, dangerous, or unfit for human habitation; section 4 of the Act of July 25, 1913, P.L. 1041, as amended, 53 P.S. §14454 requiring in cities of the First Class, that permits issued by the Bureau of Health be posted conspicuously within the premises to which they refer; section 7 of the Pennsylvania Innkeeper's Rights Act, the Act of October 30, 1996, P.L. 732, as amended, 37 P.S. §107, providing that "this Act shall not apply to an innkeeper unless the innkeeper posts a copy of this Act at or near the guest registration desk;" section 10(c) of the Pennsylvania Anti-Scalping Law, the Act of May 2, 1947, P.L. 143, as amended, 4 P.S. §210(c), requiring "[e]very licensee [to] cause to be posted and at all times display . . . a price list showing the established price and the price being charged . . . for every type of ticket. . . ." Finally, the Crimes Code, 18 Pa.C.S. §6503, entitled "Posting advertisements on the property of another" defines the summary offense to be "post[ing], paint[ing], brand[ing] or stamp[ing] in any matter . . . any building, fence, bridge, gate, outbuilding or other object [with] . . . any written, printed, painted or other advertisement, bill, notice, sign or poster . . . ." We have also discussed in the text below the posting requirements found in article 9 of the Pennsylvania Municipalities Planning Code and in the Real Estate Tax

condemnation and taken at the April 6, 2000 special meeting should be unaffected by this failure because: (1) neither of the condemnees herein has standing to raise the issue;[24] (2) the violation was harmless, "merely technical," or de minimis[25] and in any event, that (3) we should exercise our discretion, codified at 65 Pa.C.S. §713 reproduced in the margin above, to sustain the validity of the action notwithstanding the violation.

In support of these arguments the school district first emphasizes that each of the parties to these proceedings was, either in person or by legal counsel or both, present at the 8 a.m. meeting of the board of school directors. The school district chiefly relies on such decisions as that reported in *Jeske v. Upper Yoder*

---

Sale Law which are of particular similarity of purpose to the Sunshine Act posting requirements here at issue. These are but a few examples of the legislative enactments which depend for their meaningful mandate on a concept of posting notice the school district here seeks to obfuscate. Acceptance of the school district's contention that a notice can be "posted" while secreted within a private file in a private office, would have broad implications inconsistent with the evident legislative intent underlying this and similar legislation.

24. Any challenge to the standing of condemnees to raise the issue of the alleged violation of the Sunshine Act would have to be rejected on the force of the broad statutory description of persons authorized to bring such challenges. 65 Pa.C.S. §715 provides that a judicial challenge under the Sunshine Act "may be brought by any person. . . ." See also, section 710.1(c). See *Consumers Education and Protective Association v. Nolan,* 470 Pa. 372, 381, 368 A.2d 675, 680 (1977); *Press-Enterprise Inc. v. Benton Area School District,* 146 Pa. Commw. 203, 604 A.2d 1224 (1992) (construing the materially identical language of former section 9 of the Act of July 3, 1974, P.L. 388, 65 P.S. §269).

25. From the Latin "de minimis non curat lex" meaning , roughly, "the law does not concern itself with trifles."

*Township,* 44 Pa. Commw. 13, 17-18, 403 A.2d 1010, 1012 (1979) in which Judge Rogers, for the court wrote:

"[A] harmless failure strictly to comply with the public notice requirements of the Sunshine Act will not always result in the invalidation of action taken at an otherwise duly constituted public meeting."

In *Jeske,* the place of the meeting had been inadvertently omitted from the advertised notice. The court held this violation insufficient to warrant invalidation of all action taken because the meeting was held in the usual place for such meetings, was well-attended by the public, and there was neither allegation nor evidence of any prejudice created by the omission. Similarly, in the case reported as *O'Hara Township Board of Commisioners v. Hakim,* 19 Pa. Commw. 661, 339 A.2d 905 (1975), where the unanticipated presence of a large crowd required the meeting place to be moved, an announcement to that effect was made to those present, and no prejudice was alleged, the court refused to invalidate all action taken at the meeting.

In a similar decision of this court, *In re East Whiteland Township Zoning Hearing Board,* 11 Ches. Co. Rep. 15; 28 D.&C.2d 107 (1963), notice of a continued session of a public meeting was advertised and posted but did not state the place of the meeting which, in fact, was the place where all such meetings are regularly held and where prior sessions of the same meeting had been held: the township building. We held this violation to be insufficient to justify invalidation of all action taken. These facts are materially identical to those presented in *Jeske* and this result seems to us to be appropriate. However, there is language, in this court's

opinion, which could be read to require a showing of actual prejudice to a party. We hold that the intervening codification of legislative findings and the declaration of the public purpose to be served by the Sunshine Act contained in the Act of October 15, 1998, as is discussed below, clarifies that it is the interest of citizens and the public generally, and not that solely of the parties, that is to be served by the Sunshine Act notice requirements.

We find *Jeske* and *O'Hara Township* not controlling, and the school district's reliance thereon, unpersuasive. Existing laws relating to open meetings and other ethical obligations of public officials were consolidated and codified by the Act of October 15, 1998, P.L. 729, no. 93, which included, for the first time, the following statement of legislative findings and a declaration of the public policy underlying the Sunshine Act in the following terms:

"¶702. *Legislative findings and declaration*

"(a) *Findings.* The General Assembly finds that the right of the public to be present at all meetings of agencies and to witness the deliberation, policy formulation and decision-making of agencies is vital to the enhancement and proper functioning of the democratic process and that secrecy in public affairs undermines the faith of the public in government and the public's effectiveness in fulfilling its role in a democratic society.

"(b) *Declarations.* The General Assembly hereby declares it to be the public policy of this Commonwealth to insure the right of its citizens to have notice of and the right to attend all meetings of agencies at which any agency business is discussed or acted upon as provided

in this chapter." 1998, Oct. 15, P.L. 729, no. 93, §1, effective in 60 days.

There can now be no doubt that the primary purpose of the Sunshine Act is to afford citizens generally an opportunity to observe the processes of their government. *Press-Enterprise Inc. v. Benton Area School District,* 146 Pa. Commw. 203, 604 A.2d 1221 (1992). "The Sunshine Law plays a vital role in opening the doors of government decision-making to public view. The law requires that formal action . . . be taken at public meetings. It also requires that public notice of such public meetings be given prior to the meetings. The law sets forth the manner in which public notice is to be given and it intends that it be given in the manner specified." *Bensalem Township School District v. Gigliotti Corp.,* 51 Pa. Commw. 609, 615, 415 A.2d 123, 126 (1980). The Sunshine Act's purpose is to "protect the public's right to observe the procedures of government and to participate in the processes by which the life of the citizenry is governed." *Bradford Area Education Association v. Bradford Area School District,* 132 Pa. Commw. 385, 389, 572 A.2d 1314, 1316 (1990), quoting the opinion below of President Judge John M. Cleland for the Court of Common Pleas of McKean County.[26] In the case reported as *Consumers Education and Protective Association v. Nolan,* 470 Pa. 372, 384 n.4, 368 A.2d 675, 681 n.4 (1977), our Supreme Court wrote the following:

"[S]ection 5 [of the Sunshine Act, then codified at 65 P.S. §265] makes it plain that adequate notice to the

---

26. The decision is discussed at greater length in the text below.

public at large is an integral part of the public-meeting concept; a meeting cannot be deemed to be public merely because its doors are open to the public if the public is not properly informed of its time and place."

The issue of the necessity of providing posted notice and of the effect of a failure to do so has been decided frequently in the context of section 908(1) of the Pennsylvania Municipalities Planning Code, the Act of July 31, 1968, P.L. 805, as amended, 53 P.S. §10908(1), which requires notice of the proceedings of local zoning hearing boards to be "posted on the affected tract of land at least one week prior to the hearing." In the case reported as *In re Appeal of Conners,* 71 Pa. Commw. 213, 454 A.2d 233 (1983), the posting requirement codified at MPC §908(1) was first held to be mandatory. In *Eaton v. Zoning Hearing Board of the Borough of Wellsboro,* 80 Pa. Commw. 392, 471 A.2d 919 (1984), the court followed *Appeal of Conners* and invalidated a zoning hearing board decision granting special exception relief for failure to post notice of the hearing. As in this case, the appellee in *Eaton* argued that the parties on appeal had been present at the hearing below and therefore, were not in a position to complain about the sufficiency of the notice. The court soundly rejected this contention, writing the following:

"Appellees argue that appellants have received actual notice and have not been prejudiced by the lack of posting. Although appellants may have received notification by other means such as letter, telephone call, or newspaper publication, the presence of these other forms of notice does not overcome the failure to post notice as required by the statute. The legislature intended that

posting be required so to properly inform the general public, not just the appellants. Whether appellants were prejudiced by the lack of posting is irrelevant and contrary to the logic of our holding in *Conners.*" *Id.,* 80 Pa. Commw. at 394-95, 471 A.2d at 920-21.[27]

This court, in the case reported as *In re Appeal of Russell B. Jones,* 18 Ches. Co. Rep. 159 (1970) (per Judge, later President Judge, Marone)[28] considered the action of a zoning board of adjustment following a hearing of which advertised notice only had been given in violation of the local zoning ordinance which required that the board "post three notices of the time and place of the hearing in public places in the township . . . ." The court held the failure to post the notice to be a jurisdictional defect; citing such cases as *Kelly v. Philadelphia,* 382 Pa. 459, 115 A.2d 238 (1955) for the proposition that insufficient notice invalidates the official action subsequently taken at the meeting and noting that "[t]his has been held even though some citizens had ac-

---

27. Of course, "a public agency may cure the effect of a meeting defective as to notice by ratifying the action at a subsequent meeting properly held." *Coder v. Commonwealth State Board of Chiropractic Examiners,* 79 Pa. Commw. 567, 570, 471 A.2d 563, 583 (1984). Accord, *Erie Municipal Airport Authority v. Automation Devices Inc.,* 15 Pa. Commw. 273, 325 A.2d 501 (1974); *Jeske v. Upper Yoder Township,* 44 Pa. Commw. 13, 403 A.2d 1010 (1979). It does not appear that the school district has here acted to ratify its actions on April 6, 2000. It must also be noted, however, that the action of East Bradford Township later in the day on April 6, 2000 made any "cure" of the notice deficiency futile. See note 10 in the margin above.

28. Concerning action of the local authorities taken at a time prior to the effective date of the posting requirement codified at MPC §908 and set forth above.

tual notice of a hearing and is based on the fact that where a legislature confers police power upon a municipality and has designated with particularity the form of notice to be given citizens of a hearing, those provisions cannot be relaxed." *Id.,* 18 Ches. Co. Rep. at 160. No reason appears why the rule should be less demanding in cases involving the governmental exercise of the power of eminent domain.[29]

Indeed, the power to condemn private land to the purposes of the public is conceptually akin to the governmental power to force the sale of private land for non-payment of taxes. Decisions concerning the effect of a failure to post the notice required by section 602(e)(3) of the Real Estate Tax Sale Law, the Act of July 7, 1947, P.L. 1368, as amended, 72 P.S. §5860.602(e)(3),[30] are, therefore, particularly persuasive in the present context. In *Casanta v. Clearfield County Tax Claim Bureau,* 62 Pa. Commw. 216, 220, 435 A.2d 681, 683 (1981), the court held that it is the burden of the municipal agency to prove compliance with the statutory notice requirement. The primary purpose of posting notice is to inform the public generally of the impending sale. *Chester County Tax Claim Bureau v. Griffith,* 113 Pa. Commw. 105, 108-109, 536 A.2d 503, 504-505 (1988); *Trussell Appeal,* 102 Pa. Commw. 32, 35, 517 A.2d 221, 222 (1986); *Hunter v. Washington Tax*

---

29. As Mr. Justice Musmanno wrote in *Winger v. Aires,* 371 Pa. 242, 244, 89 A.2d 521, 522 (1952), "The power of eminent domain, next to that of conscription of manpower for war, is the most awesome grant of power under the law of the land."

30. Which provides: "(3) Each property scheduled for sale shall be posted at least 10 days prior to the sale." 72 P.S. §5860.602(e)(3).

*Bureau; In re Upset Price Tax Sale of September 10, 1990* at 57-58, 606 A.2d at 1258. Accord, *Ganzer v. Erie County Tax Claim Bureau,* 163 Pa. Commw. 522, 527, 641 A.2d 1261, 1263 (1994).

The factual circumstances in *Ban v. Washington County Tax Claim Bureau,* 698 A.2d 1386 (Pa. Commw. 1997), were that the taxing authority followed its usual practice of posting notice on the premises' door most likely to be used by the occupant, in this instance, a "rear entrance door, apparently not visible from the public street or public sidewalk fronting the property." *Id.,* 698 A.2d at 1387. After noting the agency's burden to establish compliance with the statutory notice requirement and the primary purpose of posting to notify the public generally, the court reversed the trial court's decision upholding the tax sale, reasoning:

"While the choice to place the posting on a door which the tax bureau believed to be frequented by the occupant was well intentioned and probably the most likely location to notify the occupant of the impending sale, the statute requires that notice be posted so that it can be seen by the public as well as the occupant.

"Whereas the posting in this case was not conspicuous, did not attract attention, and was not placed there for all to see, we find that the trial court's decision that the posting was reasonable and likely to ensure notice was not supported by substantial evidence." *Id.,* 698 A.2d at 1389.[31]

---

31. Thus, this case makes clear that the good intentions of the agency will not prevent the imposition of the statutory sanction for failing to properly post required notice. In this case, neither the merits of the views of certain members of the board of school directors that it

Similarly, in *In re Tax Sale of 28.8525 acres in Middle Creek Township,* 688 A.2d 1239 (Pa. Commw. 1997), the trial court held that the failure to post was not fatal where it was stipulated that the property owners had actual notice. The Commonwealth Court reversed, holding that the purpose of posting notice is to notify the public generally. *Id.,* 688 A.2d at 1241-42. In *Rinier v. Tax Claim Bureau of Delaware County,* 146 Pa. Commw. 568, 606 A.2d 635 (1992), the court rejected the argument that the agency is entitled to a presumption of the regularity of its official actions in a case where the evidence of posting notice was ambiguous and held that, in the absence of evidence of posting, the sale must be set aside. *Id.,* 146 Pa. Commw. at 581-82, 606 A.2d at 641-42.

To the same effect, Judge Gawthrop's opinion for this court in *Carter v. Tax Claim Bureau of Chester County,* 33 Ches. Co. Rep. 94, 95 (1985) and Judge Sugarman's opinion for the court in *Stauffer v. Swift,* 34 Ches. Co. Rep. 322, 325 (1986), held that in the absence of affirmative evidence of the posting of notice and the presence in the record of the affirmative testimony of witnesses that they were in a position to observe but did not see any posted notice, the tax sale must be set aside. These principles are equally applicable in this case where the school district was unable to adduce evidence of posting and the affidavits of witnesses in a position to observe any such posting contain the representation that there was none.

_____

was necessary to preserve the Singer tract as a viable site for construction of the proposed high school, nor the good faith of those who held such views, are here at issue.

The considerations controlling the adequacy of posted notice under article 9 of the Municipalities Planning Code and section 602 of the Real Estate Tax Sale Law are persuasive here. As in *Eaton,* the school district here contends that any noncompliance with Sunshine Act section 709 was harmless since the record indicates that the condemnees were present or were represented at the 8 a.m. meeting of the board of school directors. This contention is predicated on a misunderstanding of the primary purpose of the statutory notice provision. The parties most directly affected by the actions of a local agency will, in the usual case, obtain scheduling information by means more direct than the study of classified advertisements or of public notice boards. In the case of adjudicative proceedings and those legislative functions involving the rights and interests of identified individuals (including the eminent domain proceedings here at issue), the local agency's delivery of individual notice to the affected person(s) is required by separate statutory mandate.[32] In most instances, the identified individuals will also avail themselves of the authority under the Act and the municipal codes to demand individual notice mailed directly to their attention or to that of their legal counsel.[33] Many will additionally make telephone inquiries.

---

32. See for example, section 405 of the Eminent Domain Code, 26 P.S. § 1-405, entitled "Notice to condemnee" and requiring written notice of the filing of the declaration of taking to be served in the manner of a complaint or "by posting a copy of the notice upon the most public part of the property."

33. See for example, Sunshine Act §709(c).

The Sunshine Act notice provisions, while universally applicable, are not designed primarily to serve the needs of "parties" to the proceeding. Instead, advertised and posted notice is required in order to foster the legislature's primary purpose of facilitating with respect to the processes of governance, the direct participation in, and observation of, the public generally; that is, those individual citizens interested as a general matter in the work of the local agency and in its legitimacy as well as those affected by the actions of the agency as taxpayers,[34] proponents of wise and efficient government and obedience to the law, and as members of the pertinent electorate; but not otherwise directly affected by the outcome of the particular matter before the agency for decision. It is to the interests of these citizens that the mandate to post notice codified in Sunshine Act §709 speaks most directly.

The record here demonstrates that a large number of persons interested in the actions of the school district in just this sense attended the public meeting noticed for the evening of April 5, 2000. The record contains a videotape of the proceedings on that date and the venue, a large auditorium located in the Stetson Middle School, is clearly visible. The meeting was well attended and a majority of the attendees remained interested and involved throughout the whole of the more than three hours of unrelieved technical presentations. In stark contrast, it is conceded that the meeting conducted in the morning of April 6, 2000 was attended only by the

---

34. And, in the case of the actions of school districts, those interested as the parents of school-aged children.

school district's governing body and administrators and the parties herein and their representatives.[35] Additionally, we find to be most significant that representatives of the local press, as the vehicle by which a majority of those interested obtain their knowledge of the workings of local government, were in attendance in the evening of April 5, 2000, but the record contains no indication that any member of the press attended the meeting conducted the following morning.

In *Bensalem Township School District v. Gigliotti Corp.*, 51 Pa. Commw. 609, 415 A.2d 123 (1980), the school board argued that invalidation of its formal action by the trial court for a failure to provide public notice was unjustified because a general news article appearing in the local paper had disclosed the meeting schedule and because the presence of members of the public in attendance at the open meeting militated against invalidation. The school authorities relied, as does the condemnor herein, on the opinions in *Jeske* and *O'Hara Township* described above. The Commonwealth Court, in affirming the decision below invalidating the school district's official action, reasoned as follows:

"The remaining question is whether this lack of compliance, termed by the district as 'technical' noncompliance, mandates that the resolution be invalidated. We hold that it does. . . .

"The district argues that since word of the meeting did appear in two newspapers, the meeting was open to

---

35. The record contains the "sign-in sheets" by which all persons entering the Spellman Administration Building on April 6, 2000 are identified.

the public and members of the public did attend, it would be an unduly harsh result to invalidate the resolution. The district also argues that because section 9 of the law, 65 P.S. §269,[36] authorizes the courts to enforce the law through declaratory judgment, injunction, or 'other remedy deemed appropriate,' automatic invalidation of the resolution should give way to the application of equitable principles in fashioning relief. In some contexts, the district's argument may have merit. [Here follows a discussion of the *Jeske* and *O'Hara Township* decisions described above including the circumstances, described as exceptional that, in *Jeske,* apart from the omission of the meeting place, the challenged advertisement was entirely proper, the meeting was held at the governing body's usual place for such meetings: the only municipal building, and a large public contingent was present at the meeting, and, in *O'Hara Township,* that the relocated meeting was compelled by the unexpected presence of a large crowd, a public announcement was made of the change, and the public attendees accepted the relocation without objection.] . . .

"None of those exceptional factors are present in this case. Here, the board did not merely fail to comply with all of the requirements of section 5; rather, it did not even attempt to comply with the law's requirements. It is not enough to say that despite the lack of notice the meeting was open to the public and members of the public were in attendance. As our Supreme Court said in *Consumers Education and Protective Association v. Nolan,* 470 Pa. 372, 384 n.4, 368 A.2d 675, 681 n.4

---

36. Now codified at 65 Pa.C.S. §715

(1977); '[S]ection 5 makes it plain that adequate notice to the public at large is an integral part of the public-meeting concept; *a meeting cannot be deemed to be public merely because its doors are open to the public if the public is not properly informed of its time and place.'* " *Id.,* 51 Pa. Commw. at 613-15, 415 A.2d at 125. (emphasis in original)

We find these considerations to control the matter presently before this court. No mere "technical" violation is here involved. The evidence shows that the school district simply failed to comply with one of the two mandatory notice provisions under the Act.

The school district relies heavily on the decision of the Pennsylvania Commonwealth Court reported as *Bradford Area Education Association v. Bradford Area School District,* 132 Pa. Commw. 385, 572 A.2d 1314 (1990), affirming the trial court's refusal to invalidate official action taken at an improperly noticed meeting. The Commonwealth Court reasoned as follows: quoting the language from the decision below a portion of which we have previously excerpted in the context of our discussion of the Sunshine Act's purposes:

"In the present case, the trial court was of the opinion that it should not invalidate the June 13 vote adopting the reorganization plan. The trial court stated:

"The purpose of the [Sunshine] Act is to protect the public's right to observe the procedures of government and to participate in the processes by which the life of the citizenry is governed. It is in the light of that policy that we must determine how our discretion is to be exercised. Here the board held extensive public meetings. The public had ample opportunity to voice both objec-

tions and support for the plan. The plaintiff's officers and members met several times with [the superintendent] and the board and commented at [both] on the feasibility and advisability of the proposal. This was not a plan adopted in secret and foisted on the unsuspecting public. . . .

"We find no abuse of discretion on the part of the trial court. Furthermore, the legal challenge was not filed within the time period prescribed by the Act." *Id.*, 132 Pa. Commw. at 389-90, 572 A.2d at 1316-17.

Two points must be emphasized at the outset in assessing the import of this decision. First, in the light of the appellate court's final statement alluding to a defect in the challenge which was jurisdictional in nature, the whole of the remaining discussion could be viewed as unnecessary to the decision and, therefore, mere obiter dicta. More important, however, is the scope of the appellate court's review of the trial court's decision. The appellate court found no abuse of the trial court's discretion which had been exercised in a reasoned manner revealed by the written decision and predicated on a careful review of the record. The case provides no support for the proposition that a contrary decision by the trial court would have constituted an abuse of discretion.

In our view, notwithstanding the school district's reliance thereon, *Bradford Area Education Association* lends greater support to the position of the condemnees herein. The trial court's decision in *Bradford* turns on the fact that any Sunshine Act violation was cured by the school board's actions in conducting what was later described by the Commonwealth Court as a "plethora

of open meetings [and, thereby] protect[ing] the public's right to observe governmental procedures and to participate in the process." *Thomas v. Township of Cherry, Butler County,* 722 A.2d 1150, 1154 (Pa. Commw. 1999). In the present case, in contrast, the school board, by the affidavits of its president,[37] secretary,[38] and director of facilities and operations[39] has asserted that the public forum conducted in the evening of April 5, 2000 was not a meeting of the board but was, instead, a proceeding organized and conducted entirely by the district administrative staff for its, and not for the board's, purposes. Adopting this position[40] (by which the school district is certainly bound) in the context of the present

37. See affidavit of Bonnie R. Yost given October 26, 2000.

38. See affidavit of Pauline A. Bachtle given October 27, 2000.

39. See affidavit of Harry W. Protzmann Jr. given October 27, 2000.

40. We note that the school district's director of facilities and operations, as moderator of the April 5, 2000 public meeting, began the session by announcing that the school board had just concluded an executive session with its solicitor for the purpose of discussing pending legal matters. An announcement of this type is required by Sunshine Act §708(b) to be given at the open meeting of the board next following the executive session. We further note that it is conceded that school board members attended the April 5, 2000 meeting and that although the school board president's October 26, 2000 affidavit includes, in ¶6, the representation that "[t]he school board secretary was not at any of the public input meetings . . .", this is inconsistent with the affidavit of the board secretary herself which, in ¶4, includes the representation that the secretary attended the second of three "public input meetings." We certainly can neither endorse nor ignore the formal record submission by a party to proceedings in this court of such inconsistent sworn statements. Finally, director of facilities and operations Proztmann announced early in the April 5, 2000 session the governing effect of the school board's policy concerning the reservation of all public comment until the completion of the formal presentations. Later

discussion, the record discloses the existence of no public meetings of the school board, other than the defectively noticed meeting here at issue, conducted prior to the formal action on April 6, 2000 at which members of the public generally voiced or had an opportunity to voice either opposition to or support of the recommended condemnation of Singer's lands.

Moreover, our review of the videotaped record of the public meeting conducted in the evening of April 5, 2000, underscores the significance of those concerns members of the public wished to bring to the attention of the school board before a decision was made to condemn the Singer property.

For example, the first citizen presenter, representing the position of the East Bradford Township Historical Commission, made an impassioned plea for the protection of certain historic and archeological resources, including a designated historic district and significant structures dating from the Colonial Period, and illustrated, through pictorial exhibits and narrative, the extent to which the proposed high school construction project would be inherently incompatible with that protection. According to this speaker, the scale of the school district's proposed construction project would engulf and, thereby, destroy the integrity of the long-standing historic district. In addition, it was asserted that the project includes lighted tennis courts and parking lots within two hundred feet of the historic Taylor House built and occupied in about 1727.

---

in the meeting in response to a challenge to this procedural stance, Mr. Proztmann responded with the assertion that the school board always conducts its meetings in this manner.

Other speakers identified themselves as taxpayers and volunteered their willingness to bear an increased burden of taxation in order to prevent the necessity of acquisition of property by condemnation. These comments were predicated on the belief, undisputed on this record and included in the analysis of the school district's consulting engineers retained for the purpose of site selection analysis, that the most likely alternative site (unlike that of Singer [41]) is one which the owners have proposed for some time to develop and sell. These citizens expressed the desire to present to the school board their principled position that the willingness of a landowner to sell his lands for school purposes, on the one hand, and the desire of a landowner to preserve his lands for agricultural and open space purposes, on the other, should be among the factors given the greatest consideration in the decision whether to exercise the power of eminent domain.

Other citizens forcefully challenged the population and enrollment predictions which served as the essential justification for the necessity and scope of the construction project. The projected cost of the project also came under attack and it was asserted by a citizen participant that a cost of $20,000 per pupil served is the average for high schools constructed in Pennsylvania

---

41. The school district has alleged that Singer once proposed to East Bradford Township officials the development of his lands for a planned residential development. Board member Joseph Greene, Esquire, so testified on deposition and relied heavily on this assertion in concluding that the township agricultural security area protection should not prevail. However, the affidavits of the East Bradford Township manager and of the township engineer are to the contrary.

in the last five years while the school district's current estimate for the new Henderson High School project was in excess of $30,000 per pupil. On the other side of the issue, an East Bradford Township resident, asserting that her opinion was shared by about 100 additional residents of that municipality who were signatories to a petition she wished to present to the school board, began by stating that "no one wants Singer to be forced to sell his land" but concluded with the recommendation that the Singer tract be selected "if it is the most suitable."

The statements and positions of other public witnesses on April 5, 2000 depend, for their appreciation, on an understanding of the analytic method used for site selection by the school district's expert consultants and staff and the conclusions reached by means of the application of this method. In broadest terms, the site selection analysis was described by the expert witnesses at this meeting as proceeding by the formulation of a set of evaluative criteria, the numerical ranking and weighting of these criteria, the construction on these bases of a "decisional matrix" and, finally, the comparison of the extent to which each alternative site met the stated criteria. Of all of the criteria enumerated, the most significant was the estimated cost of construction of the proposed high school facility on the site under consideration. This one criterion was assigned a numerical ranking which assured its decisive effect in the overall analysis. Nevertheless, the consultants engaged by the district and primarily responsible for the development and application of the selection methodology, ELA Group, consulting engineers and landscape architects,

ultimately concluded that it was not possible using the method developed to choose between the Singer tract and a tract then under consideration in West Goshen Township. ELA's project manager testified on April 5, 2000 that the two sites are "generally equal" and that neither is an ideal location for the project.

With this brief background, the significance of certain statements made by the public on April 5, 2000 can be more readily assessed. One citizen argued that in the light of the controlling impact of construction cost on the final decision, an underestimate of the costs associated with development of the Singer tract could result in the selection of the wrong site, even assuming the correctness in all other respects of the methodology adopted by the district. This citizen then pointed out that the Singer tract cost estimates did not include any amortization of the operating expense related to the on-site sanitary sewage treatment and disposal system required under one of the hypothetical Singer tract scenarios accepted by the district and its consultants. The addition of a reasonable sewage plant operating expense figure, it was said, would have resulted in the selection of the alternative West Goshen Township tract where public sewer was known to be available. Another citizen challenged the figure assumed to be the fair market value of the Singer tract, arguing that the true value was substantially higher and that correcting this error would again have the effect of promoting one of the other tracts under consideration to first position in the decisional matrix.

Finally, a citizen witness challenged the objectivity of the selection methodology, asserting that Director

Proztmann had expressed a strong preference for the Singer tract at a time before the commencement of any effort to formulate selection criteria or to operationalize the selection process. Under these circumstances where the actions of the school district, including the violation of the Sunshine Act notice requirements, had the effect of insulating the school board from these and other significant statements of public concern, opposition, and support for the proposed action, the authority of *Bradford Area Education Association* can provide no comfort.

We also find to be significant the following additional circumstances established by the record and, in their essential aspects, undisputed by the condemnor. As we have noted, a meeting was conducted by the school district in the evening of April 5, 2000 for the purpose of explaining to the public the detailed normative analysis by which the various tracts of land under consideration as the site of the proposed high school were evaluated, an analysis in which a so-called "decisional matrix" assumed critical importance. The scheduling of this meeting was brought to the attention of the public by advertisements appearing generally and in the classified section of the *Daily Local News* and containing the following information:

484

# West Chester Area School District

## Site Selection for the New
## B. Reed Henderson High School
### Public Information and Input Meetings

The public is invited to attend any of the following meetings on the administration's recommendation to purchase land in East Bradford Township for the new B. Reed Henderson High School.

| | | |
|---|---|---|
| **Wednesday, April 5** | **Stetson Middle School** | **7 p.m.** |
| **Thursday, April 6** | **Peirce Middle School** | **7 p.m.** |
| **Wednesday, April 12** | **Fugett Middle School** | **7 p.m.** |

Members of the administrative team and professional consultants who participated in the site selection process will provide a detailed presentation on the criteria used to evaluate potential sites in East Bradford, West Goshen, and Westtown Townships. Public comments and questions will follow. The school board will select a site after hearing the presentations and evaluating the public input.

*For additional information, contact:*
West Chester Area School District
Spellman Administration Building
829 Paoli Pike, West Chester, PA 19380
610-436-7000

The school district concedes that the meeting conducted in the evening of April 5, 2000 was advertised as the first of three such sessions which were to serve as the forum in which the public could bring its concerns related to the site for the proposed high school to the attention of the district's governing body and that governing body could obtain the views of its constituents. The formulation of the invitation ("[t]he public is invited to attend *any* of the following meetings . . .") constitutes an implicit commitment that concerns could be expressed by members of the public during any of the

meetings and would be considered by the board. The closing statement ("[t]he school board will select a site after hearing the presentations and evaluating the public input") is an express commitment to the process and schedule described in the advertisement and consisting of official action postponed until the completion of three sessions for public comment. These commitments, the description of the decision-making process, and the schedule were reiterated during the meeting.[42] Indeed, a photographic reproduction of the advertisement set forth above was displayed on a screen and discussed early in the April 5, 2000 public session.

At the same time, however, the board of school directors, a number of the members of which attended the April 5, 2000 evening meeting, had already decided that it was necessary to truncate the announced schedule and to expedite the process by convening a special meeting for 8 a.m. the next morning, April 6, 2000, for the purpose of "authorizing its solicitor to acquire by any means, including exercise of the power of eminent domain, the property of Michael Singer."[43] As we have indicated, a notice to this effect appeared in the *Daily Local News'* classified section in the morning of April 5, 2000. The school district offers no explanation for the failure to inform those in attendance at the evening meeting on April 5, 2000 of this fundamental change in

---

42. For example, the school districts director of facilities and operations stated during the course of the public meeting conducted in the evening of April 5, 2000, that "three public forums (sic) were announced. Today is the first one—April 5. There will be one tomorrow, April 6, and the final one on the twelfth."

43. See condemnor's exhibit no. 14

the process and schedule. Neither does the school district offer any intelligible explanation[44] for the statements of the school district's representatives during the April 5, 2000 meeting reconfirming the original schedule and committing the board again to the reservation of official judgment until a time following the third opportunity for public comment on April 12, 2000. These grave misrepresentations by omission and commission, made personally by district officials to those members of the public most interested in the matter just hours before the special meeting, served only to elevate the critical significance of conscientious compliance with the Sunshine Act notice provisions. The failure of the district to comply with these notice provisions cannot be excused on these facts. Neither can this failure be seen as harmless under these circumstances. To the contrary, the only fair conclusion is that the failure of compliance had the direct effect of preventing concerned members of the public from observing the critical actions of their elected officials and of presenting cogent, documented concerns that might well have persuaded any official open to reason that the rec-

---

44. We have already referred to the school district's disingenuous attempt to divorce itself from the actions of its most senior administrators, while in the same breath, contending that other actions of these same administrators constitute compliance by the district and board with its statutory obligations. In fact, the school district, as an entity corporate and politic and a political subdivision, acts only through its elected officials and those to whom those elected officials have delegated operational authority. When acting within the scope of their authority, the actions of the school district's senior administrators are actions of the district itself.

ommendation of the district administrators required, at the least further examination.[45]

In conclusion, we are impelled to return to the decision of our Supreme Court in *Consumers Education and Protective Association v. Nolan,* in which the central task here presented, construing the meaning and effect of the Sunshine Act, was described in the following terms:

---

45. Having so found and concluded we must immediately emphasize that the presence in West Goshen Township on April 6, 2000 of many of the school district's existing school buildings and campuses might well have persuaded the board members, in the end, that irrespective of the relative merits of the particular sites, location of the proposed high school in West Goshen Township would be inequitable. We do not argue with (and, indeed, we have no authority to oversee) the board's ultimate exercise of its authority to set educational policy for the district. We hold only that the board must, in exercising this authority, comply with the statutory mandates contained inter alia in the Sunshine Act and that the failure so to do under the circumstances of this case where that failure cannot be said to have been without adverse effect on the purposes sought primarily to be served by the legislation will on appropriate application, require that official action taken in violation of the mandate must be set aside. See also, for example, the discussion contained in the article entitled "Sunshine Laws and Judicial Discretion," 28 Urban Lawyer 41, 49-54 (1996) in which the author persuasively argues that the widespread refusal of courts throughout the country to employ the legislative remedy of invalidation of official action for violation of Sunshine Law requirements, has greatly reduced the effectiveness of the legislation to effect the legislative purpose. "Allowing government decisions following inadvertent or good faith violations of state Sunshine Laws to stand uncorrected robs the public of the remedial power of invalidation. . . . Intent or prior knowledge should have no bearing on whether a decision made in violation of the law should stand, if the government decision frustrates the purpose of the Sunshine Law, it should be corrected through invalidation." *Id.* at 52.

"We are mindful, of course, in construing the Sunshine Law that '[t]he object of all interpretation and construction of statues is to ascertain and effectuate the intention of the General Assembly.' 1 Pa.C.S. §1921(a). We agree with appellants that the non-penal provisions of the Act must be 'liberally construed to effect their objects and to promote justice.' 1 Pa.C.S. §1928. It is clear that the object of the Sunshine Law, enacted in 1974 at a time of widespread public dismay over the Watergate disclosures of extensive secret corruption and abuse of power at the highest levels of the federal government was to open the decision-making processes of Pennsylvania government to greater public scrutiny and accountability." *Id.,* 470 Pa. at 386, 368 A.2d at 682.

Compelled as we are to serve the legislative purposes of openness in government and the facilitation of public participation in, comment concerning, and scrutiny of the activities of the elected and appointed officials to whom the electorate has granted its democratic consent, and mindful as we are of the primacy of the concerns,[46] we must enter the following:

## ORDER

And now, January 2, 2001, the preliminary objection of the condemnees Michael Singer and East Bradford Township, Chester County in the nature of a challenge

---

46. We cannot ignore in these regards the historic lessons of the national election just concluded including the obligation to reinforce our commitment to the consensual bond between those governed and those who seek to assert power as their representatives.

to the authority of the condemnor on the ground of the violation by the condemnor of the notice provisions of the Sunshine Act codified at 65 Pa.C.S. §709, is hereby sustained and all action taken by the board of directors of the West Chester Area School District during the course of the special meeting of the board convened at about 8 a.m. on April 6, 2000 is hereby declared to be void and of no effect.[47]

47. Our resolution of this issue makes it unnecessary to decide the issues raised by the remaining preliminary objections of the condemnees. We note that pursuant to section 406(e) of the Eminent Domain Code, 26 P.S. §1-406(e), when preliminary objections are sustained, the condemnee is "entitled to damages as if the condemnation had been revoked under section 408 . . . ." Eminent Domain Code §408 provides that, in the event of revocation, "title shall revert in the condemnee as of the date of the filing of the declaration of taking. . . ." These statutory provisions would appear to resolve the central issue raised by the school district's local agency law appeal docketed to no. 00-03598. Counsel are hereby invited to inform the court by letter (or appropriate stipulation) of the status of the matters consolidated herewith.